Prometheus Radio Project, 15-3863, 64, 65, and 66. We'll start off with Ms. Campbell. Thank you, John. May I please have court? That's later. You're not asking for any uninterrupted time. It's the people who are coming after you. Is that correct? Well, I believe both sides are rated five minutes, so I would have five minutes. I believe they're splitting their five minutes. I have Ms. Walker with two minutes of uninterrupted plus five minutes additional, and I have Mr. Thobin with three minutes of uninterrupted and five minutes additional. So it's seven and eight, which is 15, and you have 15. Do you want some uninterrupted? I would like it, Your Honor. I read the court's order as giving both sets of petitioners five minutes of uninterrupted time, but obviously you have questions. I'm happy to answer them. So on your side, then, there is five minutes, two and three. Did you want more than five minutes of uninterrupted? No. Five minutes should be plenty, but I would like to reserve two minutes of my time for rebuttal. Oh, not a problem at all. Okay. Go right ahead. Okay. Thank you. As this court found in the public citizen versus child case, there comes a time when the court must let an agency know that enough is enough. That time has come in this case. Despite prior remands from this court in 2007 and 2011, specifically directing the FCC to analyze the impact of its ownership limits on ownership by minorities and women, Assume for the moment that we granted some type of relief under, let's say, APA 706, and it went back and the idea was you've delayed, you need to do something. What would be the timeline you would suggest that they come up with that something? Well, we would suggest that by June 1st that the FCC, at that point, make sure that it has all of the data that it needs, that it has analyzed the misrepresentation. So you're assuming the Third Circuit comes out with opinions that quickly? I mean, we have met the enemy and they are us. Well, you're not as slow as the FCC, I will say that. Touche. And not as fast as the Supreme Court. That they should, in the process that also reports the results, and not just total numbers, but identify which stations they believe are controlled by women or minorities, by cost line and market. They should also have the database up and running so that people can easily analyze this data and cross-reference it and aggregate it. And it should also reinstate the requirement that people who would be considered attributed owners, but for the fact that there are certain exceptions. Well, the FCC's explanation is that it has been unable to complete and analyze the data. That's necessary for it to comply with Prometheus 2. Well, it's true that there's that. You're suggesting a 60-day period, is that right? Well, they have data. I'm suggesting a 60-day period for the data that was collected in December, which they have not yet, you know, reported on at all. And I'm suggesting that hopefully that data is more accurate than the data from the years before, but they also have ways they can make it more accurate by going back to the stations it didn't file, for example, and telling them they have to file. Or if they didn't file correctly, get the correct information. But, I mean, part of the problem here is that the commission says in its brief, and they've said it elsewhere, that the chairman intends to have an order ready for the commission to vote on by the end of June. And yet, in February of this year, the commission put out an order in the diversity docket, which is part of these combined cases, where it basically admitted that they had no way to verify the accuracy of the data that had been filed in every other, you know, since they started requiring this information since 1998, because stations had not used a unique identifier, which you need to be able to aggregate the data. So, the commission has now adopted a new way of filing the data that should solve that problem. Do you think it has the data now? Well, I think it has enough data to know that there's a problem. And I think it has enough data to be able to analyze, you know, what the current state is, as well as to identify whether any of the policies that it has, that have been intended to prevent opportunities for minorities and women, have actually been successful. That's something they still haven't done. For example, they reinstated the failing station rule, but there's no evidence that that actually has any effect, mostly because stations don't have to use it because they enter into these contractual relationships, instead of trying to sell the station. I'm sorry, could you pull the microphone down just a little bit? I'm sorry. That's good, thanks. No, no, were you moving into the FSA area, or were you... Well, I would like to stick a bit with what is the possible... You go ahead. Okay, so... Is it your suggestion that, forgetting timeline, if this were to go back, that we order or ask the FCC to adopt a different definition of eligible entities, or would it also be allowable for them to say, look, we just can't do it. It can't be done in this climate. So we're not going to adopt anything. I think they have to evaluate whether the policies they have now are working. There's no dispute here that diversity is important in public interest policy. There's no dispute that there are very few stations controlled by women and minorities. So I think the condition can't just say, well, you know, there's nothing we can do about it because they haven't really tried. But the argument in the past has been because there's a perception that ADORAN puts up a roadblock. Well, ADORAN would require the Commission to meet strict scrutiny if and only if they have a system of rules that would take race or race, really, because gender isn't strict scrutiny, not applied to gender, into account. Would it mean taking into account individual differences as well, looking at each case? Part of the problem here is the Commission doesn't really have comparative licensing anymore. In fact, there are very few licenses that are ever going to be given out. We're going to lose licenses with the option. But as far as, like, the failed station, well, the purpose of that was if you have a station that's in a small market usually that's not doing well and they could sell it, they have to make known, they have to actually try to sell it so that a new owner could come in and take over before they can sell to someone in the market. And in order to sell to someone in the market, they need to get a waiver from the FCC. But how does that advance the diversity? The Commission's theory is that it makes it easier for new entrants to find out when stations are available and these stations are going to be available, you know, at lower rates because they're not doing that well and that gives them an opportunity to get into that market. But it gives everybody an opportunity to get in. It gives everybody an opportunity, exactly, and that's why the Commission has to look and see, you know, are people using this rule and who's buying them when they do use it? Does this not then hurt some of the smaller stations that are diverse if they're in economic difficulty, if we're going to press in this direction? And this gets us into the FSAs.  I mean, as I understand the broadcaster's argument is they want to have these SSAs and JSAs because these stations are failing. But if the stations are failing, they have a way to deal with it. They shouldn't. To say, well, if the public interest can only be served by five radio stations or five TV stations instead of eight TV stations, that's a substantive question that the Commission has not addressed in this order under review. They've only addressed the procedural questions about under what circumstances should these contractual relationships be attributed. Ms. Campbell, what if the FCC gets up in a couple of minutes and says, we just can't do this by May or June. It's going to take us a whole lot more time. It's going to take us maybe a year. What would be the remedy? Well, I mean, they've been saying they're going to do this all along. So I don't have a whole lot of sympathy for them. For me, it's true. We didn't really give them a time frame within which to complete their data. Well, Your Honor, you did say that they must do it during the course of the 2010 quadrennial review, which although it's not spelled out, I would assume means like before the 2014. It means like the Delaware General Assembly stopping the clock at midnight and not going through. In Public Citizen Health Research Group v. Chao, a 2002 case from our court, the claim was and the court ruled that there was too much delay. We also said we don't really know how much time we should give and an option is for the parties to agree to mediation on what the timeline should be. Is that something that's worthwhile considering here? Absolutely, Your Honor. I think that would be a good idea. I mean, we made estimates based on both trying to imagine what was possible for the FCC but also making some meaningful progress. We're certainly happy to sit down with the FCC and talk about that further and try to see if we can agree upon a schedule. On the JSAs, Intervenor Mission has a different view about their efficacy and they seem to think that the JSAs as currently employed are helpful to minorities and women. Why do you disagree with them? Why are they wrong? I'm happy to tell you. So, Nexstar and Mission have essentially been partners since the late 1990s. At that time, Mission was not controlled by women. It was controlled by the husband of the woman who now owns the stations and they have agreements for all, I think, 15 of their stations plus some low-power stations under which Nexstar operates the Mission stations. They provide all the local news. They sell all the advertising time. They share facilities. They basically provide, do everything involved in running the station except for hold the licenses which Mission continues to hold the licenses. So, in that particular case, this did nothing to promote. The JSAs had nothing to do with promoting female ownership. And in addition, having female ownership in a case where the owner is not involved in terms of producing local news, it really doesn't contribute to that local diversity which is the whole underlying theory of having the top four prohibition that you want to have the major stations separately owned so they're going to have separate newscasts and cover different perspectives and provide the public with different viewpoints. And so we consider, do we go beyond the fact of ownership? We also consider the programming itself and when we're thinking about diversity or is ownership enough? The whole idea of ownership is that the owners control the content. They control the programming. They control the finances. They control, they hire the personnel. And that's why these agreements get around that because they basically transfer all of those functions to another entity in the same market except for the license itself. And they have to keep, I think, two employees usually. But basically, that station doesn't have its own studio, doesn't have its tower, can't produce any of its own programming. Good, of course. And that's not the representation that the companies have made at least according to the GAO report. The GAO report found by looking at the FCC's public files that there were about 86 joint services, joint sales agreements, excuse me, that had been filed in the public files. So there may be, and in fact I'm sure there are many other situations where they might not reach the 15% threshold but they're still going to be controlling the actual programming, the actual local news programming because that's not going to be 15% of the total stations programming. The local news is the most profitable part of the stations programming. And I can cite you specific examples where I know, for example, in Honolulu that you have one company that controls two of the network affiliates and a third station, both violating the rules and puts the same news on all three stations. Thank you. One last question. Could you specify for me which of the FCC's actions or inactions you claim violate our Prometheus II remand? Okay. The failure to analyze how the rules they have now, how they impact opportunities for minorities and women to acquire stations. You know, we, in an ideal world, we think that the rules should be stricter than they are. But they also need to evaluate any proposed changes and they have made some proposed changes in the 2014 quadrennial that could have an impact that has to be analyzed. And then I think they also have to, you know, try to adopt, if they can, if they think there's still a problem, which I think there is, if they can't solve that problem through tightening their ownership limits or they should really seriously look at whether or not they can have some sort of a socially disadvantaged business or other. There may well be other ways to do it. And, in fact, I'm actually a little bit less excited about STDs than we used to be because I don't think there's going to be a whole lot of opportunities to actually apply that concept because we're going to end up with fewer stations, not more stations. Okay. Thank you. Thank you. Good afternoon. May I please report Helgi Walker for the broadcast petitioners on the Section 202H issue? Did I refer to you at the beginning by your first name as opposed to your last name? My last name is Walker. Yes, right. Did I say Helgi by mistake? I didn't, Your Honor. Thanks very much. I know it's Walker. It is Miss Walker. Yes, thank you. I have reserved one minute of my time for rebuttal if that's acceptable to the Court. That's fine. And you have some uninterrupted time. Two minutes per your first office. The FCC concedes that it has not made the determination of continued necessity that Section 202H requires. Thus, it has now been almost a decade since the Commission actually finished a review of the broadcast ownership rules. As a result, many of the rules have remained unchanged for almost 40 years. For example, the Newspaper Broadcast Ownership Rule is exactly the same as when it was first adopted in 1975. And the Local TV Ownership Rule is still around even though the D.C. Circuit invalidated it 14 years ago. Meanwhile, the Internet has completely transformed competition in the media industry. So this is not a case about the subtleties of agency discretion. This is a case about the blatant and systematic nullification of Section 202H. As you explained, in Prometheus I, Congress intended to create an ongoing mechanism to ensure that the rules would keep pace with competitive change. But the Commission is openly defying that directive. To make judicial review meaningful and to honor congressional intent, the appropriate remedy for the 202H violation is vacator. Absent such relief, the broadcast petitioners will continue to be subject to admittedly unjustified restrictions that hamper our ability to compete in the marketplace and our core legal injury will go unremitied. Mediation may be appropriate for Prometheus but not for us. Unlike them, we have challenged existing rules as violative of mandatory statutory requirements. Let me ask you, usually there's a scale on which you go up. You say, okay, 706, get them to move more quickly. Next might be a writ of mandamus. I'll put it in vernacular like we really do mean it. And then if they ignore that, then possibly vacator. You've gone for the home run here. You haven't even asked for either of the first two. Why? That's because 202H imposes a mandatory duty on the Commission. It shall review its rules and it shall make the necessary determinations. But that's also why 706 is there, is it not? That's correct. And the D.C. Circuit, in circumstances that were less egregious than here, vacated the cable broadcast cross-ownership rule because the Commission had given a flimsy reason for retaining it. Here the Commission has given no reason at all. Well, that's not only violative of 202H. That's arbitrary incompletion. But the D.C. Circuit, going all the way back to Allied Signal in 93, has said you have to look at the disruptive consequences. And also the gravity of the error, Your Honor, and to just blow off 202H is pretty extreme. To go your way would be like Ronald Gadget, wouldn't it? Not at all, Your Honor. It would be complete deregulation, would it not? Your Honor, the Commission would be free to readopt the rules and the Commission could adopt the transition period. But I would just point out, we've been waiting for 10 years for the Commission to do a review. The 2010 review was six years past. The record in the 2014 review has been closed for a year and a half, and we have no reason to think anything's happening at the Commission. It's an awful lot of work on the part of the Commission, it seems to me, on the part of the judiciary, and many, many lawyers that have been involved in this case, all of a sudden just scuttle the whole thing and start all over. Well, Your Honor, if the Commission had focused on the job that Congress gave it to do, none of us would have had to expend any of these resources in the first place. But to the extent you're not persuaded by our request for a vacator, we also in our brief noted that you could remand, but we would ask you to impose fairly strict conditions here again, given that the 202H violation is not a discretionary rulemaking question, like the one in public citizen or even Prometheus's request. So if we were to, let's assume that we're not going to vacate, but we might do something else. What is that something else that gets this back on track so that the Commission is able to do the job that Congress expected it to do and what this Court thought was going to be done in the prior cases here? We would ask you to remand with three specific conditions in your order. First, to impose a time limit on the FCC so that they make the necessary determinations under 202H and repeal or modify any rule that doesn't meet the requisite standards. We think 60 days from the issuance of the Court's opinion would be appropriate. Maybe they'll come up and tell us when they're going to get this done. My fear is we're going to end up with Prometheus 4. I think the more strict you are now, Judge Fuentes, the less likely we are to wind up with Prometheus 4. Maybe they'll let us know what their plans are. Well, it's been a year and a half since the record in the 2014 review was closed, and absolutely nothing has happened. And quite shockingly, not even the prospect of judicial review has moved the Commission to action. One would think they might have, as sometimes happens, come forward with an order saying, we're actually taking steps, but apparently not even the prospect of this Court's inquiry spurred them to do anything. But the second condition on a remand that we would respectfully request is an interim stay of the rules to incentivize the Commission to promptly act. This is much like what you did in Prometheus 1, where you issued a stay of the rules there pending your review, and then you maintain that stay in place pending remand. The third thing we would ask for in a remand order is a clear statement from this Court, again, so that perhaps we won't wind up here again, Your Honor, a clear statement that if the Commission does not timely act, this Court will at that time vacate the rules. Like core communications. A little bit like core communications, except, again, this is a mandatory statutory duty, unlike those other cases. If we were to vacate orders, even to stay, what does that do to the JSAs? Does that wipe them out or make them ineffective anymore? No, Your Honor, that's a separate question. The JSA rule, which probably Mr. Philbin will address, was adopted in a separate order, and that is a new rule. Our challenge goes to the rules that existed at the time, and we believe were improperly retained without any reason, analysis at all, by the Commission simply refusing to do the job that Congress told it to do. Are you aware of any other case where an entire regulatory scheme like this has been struck down? No, Your Honor, but that's because 202H is pretty unusual, and the Commission's delay is pretty extreme. And this is a case where, again, the Commission didn't just fail to give a reasoned analysis, which this Court required in Prometheus 1, based on its reading of what 202H requires. The Commission gave no analysis at all. And at Joint Appendix 2 of the order, they said, we are cognizant of our duty to do this every four years, and then they went on and simply didn't do it. I think that is pretty extreme, but public citizen is highly instructive. There, you ordered OSHA to adopt a rule, which is a very unusual judicial intervention, and those rules were purely discretionary, and there was no mandatory statutory deadline at issue in that case. So here, ordering vacator would really just be the flip side of your order to adopt a rule there, because here, of course, we're dealing with existing rules that have not been reviewed in light of competition, again, for almost 10 years, despite the fact that the Internet has absolutely changed the way in which broadcasters compete in this new media landscape, and we are the only participants in that market that are saddled by these kinds of restrictions. And the argument, of course, from the FCC is we're working on it. We just don't have enough information at this time to be able to come up with a decision, but it's not that we put it into a drawer and are not looking at it any longer. Well, Prometheus and we come from very different places, but I think one thing we agree on is the Commission has had plenty of time to do its job. I think six years is long enough. The Commission is very active in other areas that don't include any statutory mandate, and for some reason, this just never happens. And the reasons they gave, the order, by the way, didn't propose a contrary reading of 202H, Your Honor. The order just gave excuses for why the Commission couldn't do it. One of them, quite remarkably, was the pace of competitive change in the media landscape. That's the very reason that Congress wanted these rules to be reviewed, and so they could be updated, as this Court said, in Prometheus 2. The other reasons they gave were the global financial crisis and the spectrum auction, which now appears to be delayed until 2017. We wouldn't accept those answers from our teenage children about whether they had money or not. Is that a fact, that the auction that was scheduled for June? The chairman testified in the Senate last month that that could roll into 2017, and it will take at least 39 months to transition the broadcasters out of that spectrum, and if the Commission's theory is we need to study the effects of the auction on the broadcast market, that we're talking four or five years from now, we would be well into what is supposed to be the 2018 review at that time. Thank you very much. Thank you. Mr. Philbin. Thank you, Your Honor. May it please the Court, Patrick Philbin for the broadcast petitioners to address the JSA attribution rule, and I'd like to reserve one minute of my time. That's fine. Thank you, Your Honor. You argue that the FCC can't expand its ownership rules without first determining that the existing rules are in the public interest. But the logical outgrowth of that seems to be that the Commission can't even enforce its existing rules without making a public interest determination. Is that correct? Well, Your Honor, I think that's not a necessary outgrowth of the argument on the JSA attribution rule. So there are really two sources of the statutory constraints on the FCC here. Both impose a public interest standard on the FCC. One is the general rulemaking authority in Section 303R, which is the original source for all of the FCC's ownership rules. Congress imposed a public interest standard there. So the general grant of background rulemaking authority in Title III imposes a public interest standard. Then in addition, 202H imposes a constraint here because the JSA rule was adopted as part of the periodic review. And under Section 202H, the mandatory directive there, the Commission shall determine whether its rules are necessary in the public interest, means that it cannot expand a rule as part of a periodic review, whereas here it has both failed to make the public interest determination that's necessary to retain the television ownership rule in the first place and refused to consider the public interest effect of the particular expansion of the rule at issue. And they say they're going to do it, though, later on when they deal with the ownership rules. But, Your Honor, that thing will regulate now and consider the public interest later. And that's not an approach that Congress has permitted. Congress in this Court made the constraints of 202H very clear in Prometheus I. In Prometheus I, the Court explained that in a periodic review under 202H, the Commission is required to determine whether its then-extant rules remain useful in the public interest. And then it held. It went on to explain exactly what that means, saying, quote, no matter what the Commission decides to do to any particular rule, retain, repeal, or modify, whether to make more or less stringent, it must do so in the public interest and support its decision with a reasoned analysis, end quote. The JSA rule cannot survive under that standard. And the remedy you seek is that we vacate the rule as not having been determined to be in the public interest? Correct, Your Honor, because, remember, this isn't an adoption. This is unlike the situation that Ms. Walker was addressing, the failure to act. This is an adoption of a new rule. This is a new constraint imposed on broadcasters that means that arrangements that were lawful before are now unlawful. And the Commission made that decision, it adopted that rule, without considering the effects it would have on the public interest. It said, we don't have to consider that now. That does not affect our analysis. It's not relevant. That's JA 168, footnote 1105. Public interest is not relevant. It's something we'll consider later. And that approach of regulate now and consider the public interest later violates the clear directives of both 303R and 202H. Why is it not a natural outgrowth, which is what the FCC says, of the ownership rules? And the ownership rules they claim are being en run by these attribution rules, and so they had to do something in order to effectively enforce the ownership rules. Even if that were the agency's approach, Your Honor, the agency cannot adopt what is effectively an expansion of the ownership rules. The attribution rule simply defines what ownership means for purposes of the ownership restriction, and this creates an expanded definition so that arrangements that were lawful before are now unlawful. The agency cannot do that without considering the public interest. It is the irreducible minimum core requirement under the statute for the FCC to consider the public interest of every rule that it adopts. But if the ownership rules are reviewed and readopted, this JSA rule would seem to be an integral part of the ownership rules. Any impediment on the part of the FCC including it in its review? If the JSA is right, the rule can be vacated, but it can be reinstated. It could be reinstated if the FCC gave appropriate notice and did its job correctly and considered the public interest. I think one thing to bear in mind, Your Honor, if you go back to the 2002 biannual review where a similar rule was adopted for radios, for radio JSAs, which this Court reviewed in Prometheus 1, paragraph 321 of that order is a critical paragraph where the FCC weighed the public interest benefits of radio JSAs and determined that the benefits there were outweighed by other considerations. The agency didn't do that here. It did exactly the opposite. It was a very different approach. The agency said here, we don't have to consider the public interest benefits of television JSAs. We're going to say they're attributable now. And some later time when we get to the 2014 quadrennial review, which we still don't know when it's ever going to be completed, that's when we'll consider the public interest. That is simply not an approach that's permissible. And even if the agency could adopt this rule if it did the public interest analysis, it doesn't mean this rule can be salvaged now when it's on review because the agency didn't do that. And it can't try to salvage it at this point. I gather you have another argument and that is there simply was no record support that these rules were being used to circumvent the ownership rules in the way that the FCC claims they were. Is there? It was a pretty strong statement that you made. Do you stand by that, that the record evidence is not there? We do stand by that, Your Honor. And it was also the exact same assessment was made by Commissioner Pai in his dissent because he pointed out that the FCC, and this is a JA-227, did not identify a single example of a situation where a station in a JSA exercised undue influence over another station or a single instance where a JSA has allowed one station to influence a single programming decision of another station. And I would point the Court in particular to the National Fuel Gasifier versus FERC case, which was cited by Mission Broadcasting, because there the D.C. Circuit pointed out that professing that an order ameliorates a real industry problem, but then citing no evidence demonstrating that there is in fact an industry problem is not reasoned decision-making. That's exactly what the Commission was doing here. Now, the Commission can in some cases rely on its expertise, but it still has to be tied to evidence in the record. That's the basic rule of reasoned decision-making, tying the decision from the facts found to the choice made. When there are no facts, when the agency doesn't actually have anything to point to showing that this influence materialized in the real world, it has nothing factual in the record to tie its decision to. And that's one of the many reasons the JSA rule was arbitrary and capricious. We've also explained in our brief, Your Honor, it's arbitrary and capricious also because the agency failed to consider the public interest benefits of JSAs, which do in fact promote female and minority ownership. And by decreasing costs for stations in small to mid-sized markets, they reduce barriers to entry. And Petitioner Howard Sturt has explained that its JSAs with Sinclair Broadcast Group have enabled it to create one of the few African-American-owned full-power broadcast stations in the country. That's due to the cost savings that come from JSAs. All of those benefits, promoting minority ownership, female ownership, promoting local news programming that wouldn't otherwise be possible, promoting investment in capital items like Doppler radar, which is providing vital services to communities, all of that couldn't be done. I have a question for you. Can the FCC separately adopt the JSA rule without necessarily justifying its ownership rules? Your Honor, let me answer that in sort of two stages, if I may. If we just put 202H to one side for a second, could the commission at some point issue an NPRM and say we're going to consider expanding our attribution rule and went through notice and comment and made the necessary determination, yes, it could. Now, in a 202H periodic review, though, when it's doing that periodic review and it is under a mandate to determine whether its existing rules are necessary in the public interest, then no, it may not because the agency has to first determine that the existing rule is still in the public interest before it can expand that rule. It would be logically incoherent. And this, I believe, is part of the reason the agency didn't do this. It would be logically incoherent to come out and say, we can't determine whether the local television ownership rule is in the public interest or not, but we can determine that making this expansion to the rule is in the public interest. Thank you, Your Honor. Mr. Gossett. Thank you, Your Honor. This is David Gossett for the Federal Communications Commission. If it's okay with the Court, I'd like to start with the Joint Sales Act agreement issue that Mr. Philbin. Why don't we start with why so long a delay? Happy to start there, if that's what you'd like me to, Your Honor. This is like deja vu all over again. Your Honor, when the Commission was confronted with resolving its 2010 quaternional review, it determined that it was unable to reach a resolution at that time. What the Commission did was emerge all the way back to 2004. We said then we expect a prompt action. What's causing the delay? Just in plain words, what's causing the delay here? I'm not sure it's fair to go back to 2004, Your Honor. Whatever the delay, what is causing the delay? We resolved the 2006 quaternional review, and this Court reviewed it and affirmed, in large part, our decisions on those rules. So Ms. Walker's allegations that those rules are sort of extraordinary and very dated, I think, is very- You seem to be dancing around the question. I'm just as interested in Judge Ambrose's question as all of us are. Why are you going to get it done? What is taking so long? The Chairman committed to having an order resolving both the 2010-2014 quaternional reviews and this Court's remand of the diversity order circulated to the five commissioners of the FCC by June 30, 2016, and he is still intending to do so. So an order addressing all the issues here should be before the entire Commission within 73 days. Within 73 days? Seventy-three days from today. The Commission at that point will have to, of course, review that and discuss it, and it will take some amount of time for the full Commission to adopt such an order, but at the time the Commission voted to merge the 2010 and 2014 quaternional reviews, the Chairman made that commitment, he made that commitment at that time in the order, he made that commitment to Congress, and he plans to keep that commitment. Assume that we do grant some type of relief under 706, but we don't know what the timeline should be. Would this case be akin to what I asked Ms. Campbell about, which is under public citizen health, of our 2002 cases, 2002 case, to have the parties agree and perhaps be a mediation to agree on what a reasonable time should be? Because I'm not sure I can tell you what it should be. Respectfully, I think this case is much more similar to the oil chemicals case that predated public citizen v. Chao in that by the time this Court confronted the public citizen v. by which they were going to issue a notice of proposed rulemaking and had repeatedly missed those dates. We're not in the same circumstance. I mean, the Commission here has strived valiantly to address both the questions with respect to the quaternional reviews and the separate questions with respect to the eligibility definition, and admittedly this Court didn't fully agree with the Commission's results in Prometheus II, but we have taken that into consideration in the proceedings on remand. But the only plausible deadline that we have missed is arguably we've missed a deadline with respect to the 2010 quaternionals. But that's far afield from a situation in which the Commission has repeatedly missed deadlines. We're trying, we're trying hard, we're working very hard at it. So I don't actually think this is a situation in which this Court's mandamus review would be appropriate. Well, let's start with 706. Let's say we don't do mandamus. What would be a reasonable time? What do you project would be a reasonable time that you could commit to here today? Well, I'll talk about 706 in a second, but on a schedule, again, I don't, as I said, the Commission plans to have an order circulated in June. It certainly will take some months for the Commission to fully adopt that. I think we're not talking in terms of years. We're talking in terms of months before the Commission would realistically have an opportunity to resolve the question. To the extent you can, what would you suggest today would be the number of months beyond June 30th? I mean, it's a multi-member body. It's hard to bind them. I'd rather not say that it will be resolved by a certain date because I'm talking about you. Would you be opposed to talking with the other side as to what a reasonable time should be and if there can't be agreement, then possibly somebody doing what happened in Chao, which is try and help you along? It's a court order of mediation. We'll go through with that. I mean, in Chao, the mediation was actually not successful, but the parties were unable to reach an agreement, and the panel eventually issued a schedule allowing two years for the notice of proposed rulemaking and another couple of years after that for an actual order. So even at the time when they were issuing that order, it was four more years before that rulemaking was resolved. And I do want to point this court to the court's international union case, which at 361 F. 3rd, 255 notes that the Chao decision was very much motivated by the fact that human lives and health were at stake, so we're not in a situation like that at all. But on Section 706, respectfully, I don't think Section 706 gives this court jurisdiction to grant that sort of relief. I mean, the FCC orders a review subject to the Hobbs Act. The Supreme Court is clear that the APA is itself not a jurisdictional statute. That's the Califano case. So to the extent that this court has jurisdiction, it's under the Hobbs Act. Let's get into the final orders. If somebody says that you have overly delayed, delayed by a big margin, coming up with a definition of eligible entities, what is the relief they can possibly get? They could get an order to do so by a date certain. That goes to Ms. Walker's argument with respect to the quarterly review. I mean, the relief available under 706 is clearly simply in order to do something by a certain date. That's the Supreme Court's Norton case. And I was saying to you, what is your projection? It sounds like you're saying if it's a matter of months, are you saying the end of this year? I think it's reasonable to presume that the commission would be able to adopt an order by the end of this year. How does the commission interpret? I believe Ms. Walker was making reference to this. In 202, the phrase, the commission shall review, this is Congress's directive, shall determine and shall repeal. How does the commission interpret the word shall? As mandatory, Your Honor. But nothing in Section 404 says four years and we have to jump off a cliff. I mean, the question is, what should the commission do in a circumstance where they are unable to do that? You can't keep kicking the can down the road. I mean, shall, to me, seems very imperative. I agree, Your Honor, but two things. First, we've only missed at most one quadrennial review deadline. We're only talking about the 2010 quadrennial on that. So, even if we're in the realm of an analysis of what to do for an agency missing a deadline, under the track factors that this court looked at in chow, a statutory deadline is only one of a number of factors that the court is supposed to look at to decide, you know, in a comprehensive analysis, whether the court needs to step in. Beyond that, here, the commission is working hard on the quadrennial review remand and on the diversity issues and the chairman has committed to having an order circulate by June 30th to the full commission. The question becomes, Judge Francis, what should the commission do in a circumstance where it's determined that, based on the staleness of the record, inabilities to delay, et cetera, they're unable to come up with an order that they can defend one way or the other. So, that's the situation where what the commission did was merge these two to try to get us back on track, as I believe Mr. Jambro once said. We're trying to get back into a situation where we can do these on the quadrennial obligation, quadrennial schedule. But at this point, the best way to do that is to let us issue that order, I would say. What needs to be done in order for you to either adopt an eligibility's definition, either the socially and economically disadvantaged business might be one option or overcoming disadvantages preference might be another option, but how much more information do you need to come to a conclusion as to which way to go? I mean, Adirond, which has been put up a number of times, has been around now for, what, 21 years? The commission tentatively concluded in the further notice that it cannot adopt a definition besides the eligibility definition, that it doesn't have the record to do so. But a lot of studies have been done. How many more studies have been done? We've done a lot of studies. They don't show evidence sufficient to take that action. May I take a step back for a second? I mean, the commission has identified two interests that might be sufficient to satisfy strict scrutiny. There might be a compelling interest under this. Well, strict scrutiny would apply to race, but not as to race. But strict scrutiny, let's stick to race for one second. Those are advancing viewpoint diversity and remedying past discretion. I mean, it's clear that we can't take an action specifically for the purpose of increasing minority ownership. That is not itself a compelling governmental interest. The compelling governmental interest that the commission has identified is advancing that increasing minority ownership might advance as advancing viewpoint diversity. The commission has now undertaken or contracted for a number of studies, and those studies simply just don't show the relevant relationship. So there are at least 12 studies that have been done that are in the record since we were last here, or 11 in the record and one that's ongoing. Seven of the 11 studies that are already fully in the record address questions of minority ownership. Two of them specifically looked at the relation between minority ownership and viewpoint diversity, and they didn't show statistically significant. So we're studying the question. Excuse me. If that, in fact, is your conclusion within a four-year period, are you obligated then to say we can't make the link, and therefore we're not going to do anything, and you've made a determination, and then you may get appealed on that, and maybe there is something in the record, and it's up to a court to decide. But don't you have to make some decision? Either we're going to modify or vacate, or we're going to say no. For whatever reason, we're not going to make a change, period. The program that is proposed is re-adopting the out-of-eligible-entity definition and not doing more than that, and the chairman is committed to resolving that by July. But we're in the proposal stage. We're in the tentative findings stage. I think that's the frustrating part of this. Your Honor, the court gave us four specific assignments, I think, in Prometheus II, all of which I think we've now done, but none of which hadn't been fully resolved by 2014. But the court also ordered us to link our review of those issues with the ongoing proverbial review issue, which raises its own set of complications, and has largely been a cause of delay here is the issues about the five minutes. As to the court's obligations, you told us to improve the data, and that's something that Ms. Campbell focused on. We have done a huge amount on that since the commission was last here. The commission has not only fly-spec'd existing data, it has released an order resolving note three of the four pending further notices on the 323 data. It has held workshops on how to fill out those forms. It has held workshops on how to use those forms to study minority ownership. We've done a lot of that data. Is there a point at which you can say we've got enough data to make a decision? The commission will make a decision in the order here as to the record today. If someone were to study the question again and come up with a different analysis in the future, we could revisit that. If the Supreme Court were to change its precedent, we could revisit that. It seems to me that you can always say, well, we need a little bit more information, we don't have enough, and you're just building delay on top of delay. I'm just thinking at some point you have to say we've got enough, we've got what we need, and we can make a decision. Decisions are made at a given point in time and can always change over time, but the proposal in the further notice and the commission hasn't yet adopted it, but at that point the commission spent 40 pages explaining why at that point, based on the record before the commission, it did not think it could take an explicitly race or gender conscious action and it should nonetheless readopt the eligible entity definition. What is the problem? Is it that you have to expand the field that you need input from? What is the nature of the problem? I'm not sure what you're talking about. What's causing you not to act? What's keeping you from making a decision? We're doing it as part of the quadrennial review as this court instructed, and that restarted in 2014. What's causing you not to act? Forget where it started. What's causing you not to make a decision? The commission intends to make a decision. What's causing it to be delayed so far? On the quadrennial review we determined that the record was inadequate to resolve the question and restarted it. What is inadequate in the record? I mean, look, I'll come back to what I was going to say after that. You've been up here now 15 minutes. We all know what's causing the problem. You're saying that the data is inadequate. What data are you missing and what further data are you seeking in progress? When do you anticipate that being done? What do you think it's likely to show? I have no clue as to where you're coming from. I'm sorry, Your Honor. If I suggested the data was inadequate, that was not what I meant to say. What I said was that this court in Prometheus II said to improve the data the commission collects on minority ownership and that we have done so. I separately said that we have studied the relationship between minority ownership diversity and viewpoint diversity and to date no study has shown the kind of relationship between those that could lead us to take an explicitly race-based action and no one has proposed another study that we think would do so. So the commission has tentatively concluded that it can't, based on what we know about the world, take those explicitly race-based actions at this time. You say tentatively. You say tentatively concluded. I agree. You're insulating yourself. Your Honor, to go back to where we started, we're here on a further notice of proposed rulemaking, not an order. When the commission resolves this order after it circulates in 73 days, there will be an order. I am sure we will be challenged on it and I expect there will be a report here and we can speak more definitively about what the commission has concluded on the evidence. I'm not able to speak for the full commission on something that they haven't yet decided. I can just discuss what the commission has done, and we've done a lot, and what the commission has tentatively concluded and asked for further comment on, and that I've said suggests that we should reinstitute the eligible entity definition and not adopt the socially disadvantaged person definition. I do want to flag the one other thing that this Court specifically said in Prometheus 2 that we should do with respect to diversity because I want to discuss how we've done that too, despite what Ms. Campbell suggested. The Court suggested that we should look at our diversity, at our ownership rules, at the five rules subject to 202H, and discuss the effects of those rules and potential changes to those rules on minority and female ownership. And the commission does that in the further notice. It discusses each of those rules. It discusses evidence about whether those rules do or do not affect minority ownership and what changes those rules might do to minority ownership and concludes that the rules, in fact, don't have significant effects on minority ownership issues. But that was another separate obligation that this Court put on us that we have undertaken and are continuing to undertake. Just to clarify, you said your quadrennial review will be completed within 73 days. Did I get that right? Within 73 days it will be before the full commission. It will be before the full commission. So you have a specific date in mind, I guess. I'm sorry. The chairman committed to circulating the order by June 30, 2016 and plans to do so. And for the definition of eligible entities, what are the options you're currently considering? The further notices talks about the eligibility definition and tentatively determines that it should be reinstated because it advances the commission's diversity goals writ large, even if not specific to minority ownership. The commission tentatively determines that it cannot adopt the socially disadvantaged business definition because it doesn't have evidence to sustain such a rule under such scrutiny. Because why? If it doesn't affect, if socially and economically disadvantaged doesn't deal on its face with race or gender, then what's the problem? That rule does explicitly deal with race. There's a separate overcoming disabilities proposal that isn't explicitly race. The commission tentatively concludes that that rule is unworkable and inconsistent with First Amendment values. That's in paragraph 399 of J137. But how do you, I mean, you got, look, you got Congress with 309J saying that you have to promote opportunities for businesses owned by members of minority groups. That's from Congress. That's not from us. And then in 94, the Supreme Court decision in terms of broadcasting says that assuring that the public has access to a multiplicity of information sources is in the interest of the highest order. That's not from us. So we've got these big authorities out there telling us, and they have the authority to tell us, you got to do something. And all we're seeing here today is it's taken longer than people are willing to put up with, longer than what the statute is supposed to have said. And you're saying, oh, we're delaying this 2010, but we're now six years from 2010. I realize they often come out late, but it's getting to the point where it's just the opposite of the beginning of the Roosevelt Administration, which is, you know, we're going to do something. And if it doesn't work, we're going to do something else. Here it sounds like we're going to do nothing. And if you complain, we're going to continue to do nothing. Respectfully, the quadrillion obligation is not applicable to this discussion. The eligible entity rules are not the rules subject to the four-year obligation. Those are rules that we have done independent of 202H. So the four-year clock on these comes from this Court's merging the two. And beyond that, look, we're constrained. Obviously, the Commission has repeatedly said it is committed to increasing the low levels of minority ownership in mass media, but we're constrained by the Supreme Court saying that we're subject to strict scrutiny. The D.C. Circuit has suggested that even one point diversity would be right for race. But not for gender. And not for gender, but though the two are – some think that the gender standard is coming in to the same. I mean, there's no evidence to support taking action with respect to gender. And conceivably, they may have to go back and take a look at ADORAN because – to clarify it, if nothing else. I mean, you've got the same types of issues, for example, with Fisher, with the University of Texas. And who knows? That's why they get paid the big bucks. But the point being, the mandate that we have before us is something has to be done. Something has to be proposed. And it can't just be slow-walked much longer. Your Honor, that's about it. Again, the Chairman is committed to resolving all of these issues in the near future. I'm sorry. What if we were to agree with Mr. Philbin and conclude that the JSA cannot stand because it's never been put to the public interest test? What would be the FCC's next move with regard to that rule? Can I challenge the presumption behind that question before I – You can challenge it, of course, but it was a hypothetical. Sure. If we had not determined in our rulemaking that something was in the public interest, it would presumably fall under the Commission's general rulemaking authority. It is not – again, that is not a question that's subject to Section 202H, though. And this is important because this goes to why it was okay for us to do these rules at this time. The Commission has never thought of attribution rules as – they've always thought of attribution rules as being separate and apart from ownership rules. So when we attributed the radio JSAs – I'm sorry. You never thought of it as separate and apart? We've always thought – I'm sorry. I corrected myself in a sentence to try to be more explicit. It is a part of – We've always thought of them as separate. Always separate. I've always thought of the attribution rules and ownership rules as separate. Doesn't it qualify the ownership rules? The ownership rules determine the levels of concentration of ownership that the Commission has determined are in the public interest. The attribution rules go to ensuring that those levels are followed. And so the attribution rules are ways of ensuring that there is an evasion of those ownership rules. If the ownership rules did not exist, would the joint sales agreements have any relevance? No, Your Honor. But the reason the Commission adopted this, the joint sales agreement rule, is because entities started using joint sales agreements to evade the existing ownership rules that the Commission has repeatedly defended, and that this Court affirmed the current TV ownership limits in 2011. So these are not limits that are of ancient ilk. And when the Commission determined that people were using joint sales agreements to evade those existing limits, it was appropriate for the Commission to attribute them. Is the record support for that? Because it seems to me it's pretty thin. It's the record support that they were being used as a method of evasion? Yes, yes. Yeah, and that was the analysis the Commission had undertaken with respect to the TV local market agreements, with respect to the radio GSA, then again here. The Commission analyzes questions of influence and control analytically and has never been able to point to specific evidence that this station is inappropriately influencing that station. It looks at the relationships. Okay, I understand that. That's the key to your argument, that as long as there's an opportunity and an incentive to exercise power and control, that's sufficient. You don't need any evidence showing that that, in fact, is taking place. So it's almost like a per se rule. If you have the power, we're going to presume that you're going to use it, and it's wrong. But is that the right way to evaluate the effect of these GSAs? The Commission implements rules. The whole theory of a rule is that it is done on a cross-industry basis. The Commission acknowledged that the broadcasters were asserting that there were public interest benefits of some joint sales agreements and said most of the benefits they were talking about were benefits that basically were arguments about loosening our overall ownership limits. So, I mean, this is most evident in the ICLAM ecosystem for this court, which talks about the benefits of joint sales agreements and duopolies. And they don't use any words. They think that the ownership limits should be reduced. The benefits alleged with respect to joint sales agreements are the benefits of combined ownership, in essence. So what the Commission concluded, and making it the public interest determination that it did, was that these joint sales agreements, quote, should not be used to circumvent our local broadcast ownership rules, which are designed to promote competition. Sure. That's at JA-168. And so you acknowledge that they've been beneficial in many cases. They've helped struggling companies. We didn't acknowledge that they have been beneficial. We acknowledged that people had made arguments about their benefits. We said that to the extent in a specific instance someone wanted to, they thought there were benefits that were warranted a waiver of the ownership limit, they could seek a waiver. And we said that generally the arguments about this were arguments about our ownership limits, and that nonetheless was not a valid basis for seeking to evade those ownership limits. I do also want to point out, with respect to the argument about the time nature of this, Congress has since grandfathered existing joint sales agreements to 2025. So to the extent someone is a member of a joint sales agreement today, or a partner to a joint sales agreement today, and think that we inappropriately are making them get out of that before we next review the overall ownership limits, we're not. We're going to be reviewing those this year and doing something in light of this. But it's also worth noting that that congressional statute grandfathering existing joint sales agreements implicitly endorses the Commission's view that these joint sales agreements are attributable interests. Well, but you were giving them two years before. Yes, we originally gave them two years, which is what we've also done with radio jams. Congress's action can also be read to say they didn't like the two-year period. They wanted a much longer period. Well, clearly they didn't like the two years. My point is that they didn't disagree with us that generally joint sales agreements should be attributed, which is our broader dispute here with Mr. Colvin. Why did you feel that? Why did you feel? Why did the Commission feel that it had to take action now, even accepting your argument that they're separate? They have some connection, there's some link with the ownership rules. Why not wait until you make the change or make no change on the ownership rules and then deal with the JSAs and maybe the SSAs too? Because the Commission thought it had an interest in preventing evasion of existing rules. That's an interest separate and apart from the overall question of where limits should be. If we set a limit, people shouldn't be allowed to engage in creative lawyering to avoid that limit. And we set the limit here. We said that in certain circumstances you couldn't own more than two stations or couldn't own two stations and people were engaged in behaviors that were designed to do essentially what we had otherwise barred them from doing. So it was reasonable to stop that practice then and there. There's also something that the Commission had to do. You're doing it on an abstract basis. I'm sorry. You said you talk about the evasion. As I understand it, the rationale behind is that there is power to evade, but not necessarily that there has been. The Commission had reviewed many joint sales agreements in the course of its merger reviews over the prior decade. The Commission had reviewed radio JSAs and had previously determined to attribute them. The Department of Justice, which had also reviewed television JSAs, suggested or filed ex parte comments in this proceeding saying you should attribute JSAs. GAO, when it looked at this, also agreed that the attribution of JSAs was reasonable. The petitioners here cite to GAO allegedly criticizing the Commission. They did not. They talked about how the Commission hasn't yet defined shared service agreements and how that's something we should do going forward. It seems to me that they were somewhat critical of your monitoring function of the JSAs. In the most recent, in the order last month, yes, they said that we should start monitoring more closely that, and the Commission has agreed in its comments in response to that note. But nothing about that GAO report suggested that GAO had any problem with our overall rulemaking or approach to joint sales agreements. Thank you for the question. Thank you, Your Honors. One of the reasons the Commission has been taking so long is that they still haven't, they haven't completed the earlier docket, 07294, the diversity docket, which was part of the 2006 Quaternary Review, and their recent action in January took care of some of those issues, but not all. But further, in that order, they made clear that their data that they had already collected was not accurate, and instead of making that decision a month early or a few months earlier when it could have affected the 2015 filing, it simply didn't do that. There's no excuse. It surely knew about that for at least three years. Now, the Commission in the notice says they're going to do two things. They're going to get the data that is in good shape. They haven't. They don't have a database, for example. They said they were going to do studies. Well, the only study they mentioned was this Hispanic television study, which they had announced in 2013. That study has still not been done. What were studies 7a, 8a, and 8b then? Those were earlier. Those were earlier, and the problem with the earlier studies were they just didn't have enough data. The data wasn't reliable enough to draw reliable conclusions, and we've been, you know, in talking to the Commission all along, and one of the things that they would tell us is, well, we can't show diversity that race to owners affects diversity because there aren't enough minority owners for us to have statistically significant results. Now, to me, that illustrates exactly what the problem is. If there's so few that you can't even say it, then you have a problem. I'm not sure that's true as a matter of statistics. I'd be told otherwise. And also, I think the Commission has a real misconception about what a showing, what it would need to show. I will point out just recently that the Small Business Administration declared that women-owned businesses in telecommunications could qualify as FDB, so that's certainly possible. As far as Mr. Philbin, I don't think he's wrong when he says there's no evidence. There's tons of evidence. We cited in our brief of nurse situations where there's a JSA, there's also an SSA, and so they're providing all of the local news. I don't know how you can influence a patient's programming more than providing the local news. Furthermore, the Bureau itself, right before this order, issued a public notice saying, we're going to be looking at these very carefully so they know about this. They just had turned a blind eye to these for a long time, just as with the problem with minorities and women. And then as far as Ms. Walker's request that the court vacate the rules, well, I don't see how the Commission could do that under 202H without analyzing what impact that would have on opportunities for minorities and women, which would be, quite frankly, devastating. And then to say, well, they can always reinstate the rules, is really no answer because you see how difficult it is to turn back the clock just with the JSAs. Reinstating rules once they're gone, it would really be practically impossible. Thank you. Thank you. Ms. Walker. Your Honor, I'll be quick. Mr. Gossett stood here and acknowledged the mandatory statutory duty that the Commission bears under 202H. His inability to give you a clear answer to your simple question as to when this might happen is, to put it charitably, telling. I'd like to clarify something, though, about what it means for an order to be circulated to the Commission, which the Chairman has said would happen by this June. That is merely a staff recommendation to the full Commission. Orders have languished and died before the Commissioners, based on media bureau recommendations. And, in fact, that's exactly what happened with the 2010 review that never got finished either. I would also point you to the note. What about the statement that after that staff recommendation goes to the Commissioners, that they would at least be tentative anticipations that they would have something done by the end of the year? The end of the year, first of all, he made no clear commitment to this Court, which is quite shocking that one would appear without the ability to do that. The end of this year, with all respect, Your Honor, would be too late. By the end of the year, the Commission should have done two quadrennial reviews by that time. And our injury is not academic, Your Honor. Broadcasters are suffering. We are precluded from achieving these efficiencies that other competitors are not. Broadcast stations are closing. Newspapers are shattering. And that's not in the public interest. You've been communicating with the other side, haven't you? I mean, we're just wondering what accounts for this extraordinary delay. Your Honor, I could not tell you. It's really, I think, up to Mr. Gossett to explain. But as far as we can tell, nothing has happened, even on the 2014 review, since the comment cycle was closed a year and a half ago. If you read the newspapers, if you still read newspapers, Your Honor, you'll see the Commission has been very busy in lots of other areas that don't involve any mandatory statutory duty. Exactly. You know, the Commission is engaged in regulation of the Internet. It's about to embark on new regulation of cable providers. None of that is mandatory. It's just not interested in complying with Congress's clear directive in 202H. One other quick point. In the Commission's brief in footnote 7, they referenced a statement by the Chairman in a letter to the Senate in March of 2014. And this is their own reason for what is happening. They say that the Chairman represented to the Senate that the 2014 review, quote, should be completed in two years. That's during Appendix 1023. That was last month, Your Honors. Is there anything different that's been said to Congress as to why there's been this delay? Not that I'm aware of. Okay. And I'm not sure it really matters why, Your Honor. Given the clarity of the command in 202H, the Commission's open acknowledgement at Joint Appendix 2 that they bear this duty, Congress's command is being cavalierly disregarded. And, again, the injury to my clients is not academic. Newspapers are struggling. Broadcast stations are failing. This is no way to- Well, I guess where I'm heading is Congress threatening to take any action? Not that I'm aware of. But that's why we have the APA in Section 706.1 and the Court's ability to compel action on agency decisions that are wrongfully withheld. Absent vacator, Your Honors, if you remand, we would respectfully ask you to attach those three conditions I mentioned. A serious time limit. We think 60 days is appropriate. The Commission has all the information it needs. It's had that information for a year and a half. An interim stay to encourage the agency to take your order seriously. And a clear statement that if they don't timely comply with your order on remand, you will consider or, in fact, vacate the rules at that time. Thank you very much. Thank you. Mr. Philbin? Thank you, Your Honor. Just some quick points first. Mr. Gossett's point that the FCC has always considered the attribution rules as something separate and apart. That, with all respect, is just a form of administrative double talk because the attribution rules are a part of the ownership rules. Their only function is to define what ownership is for purposes of the ownership rules. They're codified in the rules simply as a note to the ownership rules. So they can't be extricated and disentangled from the ownership rules themselves. Second, Congress's action in extending the grandfathering period to 10 years can't in any way be interpreted as a ratification of what the Commission did here. And I would point the Court to Judge Ambrose's recent decision in Kaplan v. St. Peter's Health Care, where the Court pointed out that the theory of congressional ratification does not apply where the statute has a plain meaning that is inconsistent with the proposed interpretation. We're not even in the box here really of an interpretation from the FCC on something, but certainly not something that's ambiguous. The statutory command here to consider the public interest is totally unambiguous, totally clear from two different statutory sources. Nothing that Congress did to try to avoid it, a train wreck, but putting some emergency legislation on an appropriations rider suggests that it put its imprimatur on everything else the FCC did. And lastly, Your Honor, just on the evidence, and then Judge Sirica asked about the evidence in the record, I'd like the Court to note that in trying to defend the FCC's decision, both Mr. Gossett and Ms. Campbell immediately went to things that the FCC did not rely on. The GAO report that was concluded outside the record and Ms. Campbell relied on, she said JSAs are associated with SSAs, and that's why there's some influence here. What the FCC concluded was that it didn't have enough information about SSAs to make any determination on them. So those references have nothing to do with the rationale that the FCC provided for its rule, and it pointed to no evidence showing actual influence. And it even pointed out the critical distinction between radio JSAs and television JSAs when it pointed out that there was no evidence that there were flat fee arrangements for television JSAs. That's something we point out in our brief. Going back to the radio JSA rule, that was something critical that the FCC had determined in radio JSAs gave this sort of influence that they were talking about. When the brokered station is only receiving a flat fee, it loses incentives over controlling its programming in the radio station. And the SEC pointed out there wasn't any evidence that that sort of fee arrangement was used here, but then it said, well, we think there can be influence anyway. It was all based just on speculation, not on evidence in the record. And most critically, the court doesn't need to get to considering the evidence because it's a threshold statutory violation in failing to consider the public interest standard. Thank you very much. Thank you. Thank you to all counsel for being with us today. I would ask counsel if you would get together with the clerk's office and have a transcript of this oral argument prepared. Split it half for this side, half for that side, however you wanted to divide it up on that side. And we'll go from there and recess. Thank you very much.